

FILED & JUDGMENT ENTERED
Steven T. Salata

October 6 2020

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Laura T Beyer*
—————————————————
Laura T. Beyer
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DIANA HOUCK,** | ) | Chapter 13 |
| | ) | Case No. 11-51513 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **DIANA HOUCK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 15-5028 |
| | ) | |
| **SUBSTITUTE TRUSTEE** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING JUDGMENT TO THE PLAINTIFF

**THIS MATTER** is before the court after trial on the complaint of the Plaintiff, Diana Houck. This lengthy litigation grew out of a short-lived bankruptcy case—although the Plaintiff's case only lasted five days, the Defendant, Substitute Trustee Services, Inc., conducted a foreclosure sale during those five days and did not subsequently undo the foreclosure or make any attempt to

validate it.  After the court's February 15, 2019 Order Granting Plaintiff's Motion for Summary Judgment, Denying Defendant's Motion for Summary Judgment, and Denying Plaintiff's Motion for Sanctions determined that the Defendant violated the automatic stay of 11 U.S.C. § 362, the only issue left for the court to determine at trial was the amount of damages to be awarded to the Plaintiff.  The trial presented a situation where a defendant committed a willful stay violation that continued for several years on the one hand, and a plaintiff who did not convincingly show a significant portion of her alleged injuries at trial on the other. Despite the Defendant's egregious stay violation, the court can only award damages proven by the Plaintiff.  After considering the evidence and argument presented by the parties and as explained below, the court awards damages totaling $260,175.27 to the Plaintiff.  The total damages consist of $20,857.11 in actual damages other than attorney's fees, $109,318.16 in attorney's fees, and $130,000 in punitive damages.

## PROCEDURAL HISTORY

1.  This lawsuit began over seven years ago when the Plaintiff filed her complaint in the United States District Court for the Western District of North Carolina ("District Court") on April 26, 2013.  The complaint, as subsequently amended, alleges that Lifestore Bank, F.S.A ("Lifestore"), Grid Financial Services, Inc. ("Grid"), and the Defendant engaged in a conspiracy in

violation of a number of state laws that caused the Plaintiff to default on her mortgage and culminated in a foreclosure in violation of the automatic stay imposed by 11 U.S.C. § 362 during the Plaintiff's (second) bankruptcy case.   The District Court referred the lawsuit to United States Magistrate Judge David S. Cayer, and Judge Cayer entered three dismissal orders between October 1, 2013 and February 20, 2014 that collectively dismissed the entirety of the Plaintiff's complaint.   The Plaintiff only appealed the first dismissal order (without leave), the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") had not considered the appeal when Judge Cayer dismissed the remainder of the complaint, and, on July 1, 2015, the Fourth Circuit applied the doctrine of cumulative finality, vacated the District Court's judgment, reversed the October 1, 2013 dismissal order, and remanded the case to the District Court.   Judge Cayer subsequently sent the lawsuit to this court with his September 22, 2015 Order of Referral to the Bankruptcy Court.

2.   Upon receiving the lawsuit and hearing from the parties, this court entered its Order Determining the Status of This Adversary Proceeding, Examining This Court's Subject Matter Jurisdiction, Recommending Withdrawal of the Reference, and Setting Status Hearing ("Status Order") on February 5, 2018.[1]

---

[1] The significant pre-Status Order procedural history of this lawsuit is presented in greater detail in the Status Order.  See Houck v. Lifestore Bank (In re Houck), Nos. 11-51513, 15-5028, 2018 WL 722462, at *2—4 (Bankr. W.D.N.C. Feb. 5, 2018).

After describing the lengthy procedural history of the lawsuit, the Status Order determines the status of the lawsuit after the Fourth Circuit's July 1, 2015 opinion. Houck v. Lifestore Bank (In re Houck), Nos. 11-51513, 15-5028, 2018 WL 722462, at *5—7 (Bankr. W.D.N.C. Feb. 5, 2018) [hereinafter *Status Order*]. The Status Order concludes that the Fourth Circuit's opinion did not disturb the two dismissal orders that the Plaintiff did not appeal, all of the claims against Lifestore and Grid had been dismissed, and the lawsuit then consisted of only the Plaintiff's stay violation claim and state law claims (except for her emotional distress claims) against the Defendant. Id. at *7. Next, the court considered whether it had subject matter jurisdiction to consider the remaining claims in the complaint. Id. at *7—12. The Status Order concludes that the court did have "arising under" jurisdiction to hear the stay violation claim, and, while it would have had "related to" jurisdiction to hear the state law claims during the pendency of the Plaintiff's base bankruptcy case, the court could not hear the state law claims after the Plaintiff's base case had been dismissed and closed. Id. Since this court could not hear the entirety of the lawsuit, the Status Order recommends that the District Court withdraw the reference so the Plaintiff could pursue it there. Id. at *12.

3.   The District Court confirmed the court's analysis of the subject matter jurisdiction question but decided to proceed in a

different manner and bifurcated the lawsuit.  On February 7, 2018,
the Honorable Max O. Cogburn Jr. signed an order that withdraws
the reference of the state law claims, declines to exercise
supplemental jurisdiction over the state law claims, and dismisses
the state law claims without prejudice to the Plaintiff refiling
them in state court.[2]  Houck v. Lifestore Bank, 582 B.R. 138, 140—
142 (W.D.N.C. 2018).  Judge Cogburn declined to withdraw the
reference of the stay violation claim.  Id.

4.  Accordingly, this court proceeded with the stay
violation claim against the Defendant.[3]  After completing
discovery, both parties moved for summary judgment.  The court
held a hearing on November 7, 2018 and entered its Order Granting
Plaintiff's Motion for Summary Judgment, Denying Defendant's
Motion for Summary Judgment, and Denying Plaintiff's Motion for
Sanctions ("Summary Judgment Order") on February 15, 2019.  First,
the Summary Judgment Order rejects the Defendant's contention that
the Plaintiff was not eligible to be a debtor pursuant to 11 U.S.C.
§ 109(g) in her second bankruptcy case.  Houck v. Substitute Tr.
Servs., Inc. (In re Houck), 597 B.R. 820, 828—31 (Bankr. W.D.N.C.
2019) [hereinafter Summary Judgment Order].  Next, the court

---

[2] The parties reported to the court at trial that the Plaintiff did refile her
state law claims and that the state court lawsuit is pending.
[3] "[A] stay violation claim is a core matter for which this court can enter a
final judgment." Status Order at *8 n.12 (citing 28 U.S.C. § 157; Johnson v.
Smith (In re Johnson), 575 F.3d 1079, 1082—83 (10th Cir. 2009)); see also Houck
v. Lifestore Bank, 582 B.R. 138, 140 (W.D.N.C. 2018) ("As to the § 362 claim,
this Court determines that the United States Bankruptcy Court is uniquely
qualified to determine whether a willful violation of the automatic stay in
bankruptcy occurred.").

concludes that the Defendant committed a willful violation of the automatic stay when it foreclosed on the Plaintiff's residence during her second bankruptcy case and did nothing to remedy the violation after receiving notice of the bankruptcy case later the same day. Id. at 831—35.

5.   The parties disagree about when the Defendant received notice of the Plaintiff's second bankruptcy case, but the court did not have to resolve any factual disagreements about the timing of the notice because the Defendant admitted to facts sufficient to show a willful violation of the stay.  After the Plaintiff commenced her second bankruptcy case on December 16, 2011 and before the court dismissed it on December 21, 2011, the Defendant conducted a foreclosure sale on December 20 at 12:57 p.m.  Id. at 832.  While the Plaintiff contends that her husband, Ricky Penley ("Penley"), contacted the Defendant's law firm by telephone on December 16 to bring the second bankruptcy case to its attention, Second Amended Complaint with Demand for Trial by Jury at 9, Houck v. Lifestore Bank, F.S.A., No. 5:13-CV-66 (W.D.N.C. Aug. 28, 2013), and the Defendant claims that its law firm has no record of a call from Penley between December 16 and 20, Memorandum in Support of Substitute Trustee Services, Inc.'s Motion for Summary Judgment at 6, Houck v. Substitute Tr. Servs., Inc. (In re Houck), Nos. 11-51513, 15-5028 (Bankr. W.D.N.C. Oct. 31, 2018), the Defendant admits that its law firm received notice of the second bankruptcy

case from Nationstar Mortgage, LLC ("Nationstar") at 3:52 p.m. on December 20—about three hours after the foreclosure sale, *Summary Judgment Order* at 832. Even if Penley did not call the law firm on December 16, the Defendant conducted the foreclosure sale in technical violation of the automatic stay, and the technical violation became willful when Nationstar brought the bankruptcy case to the Defendant's attention. <u>Id.</u>  The court expressed its displeasure with the Defendant's behavior in connection with the foreclosure and its arguments in this litigation:

> Importantly, [the Defendant] does not deny that its "practice" after learning of a foreclosure sale in technical violation of the stay is to wait and see if the case is dismissed before taking steps to undo the sale.  The court wholeheartedly agrees with the Plaintiff's contention that this practice is abhorrent.  The court is dumbfounded by the cavalier position that [the Defendant] has taken regarding its seemingly obvious stay violation.  The essence of [the Defendant's] "wait-and-see" approach is flawed and in direct conflict with a litany of case law.  If [the Defendant] learns of a technical violation, it is obligated to determine the effect of the stay and remedy its violation—not wait to see if the case will be dismissed and the "barrier" of the automatic stay removed.

<u>Id.</u> at 834 (citations omitted).  While acknowledging that it would subsequently have to determine the exact extent of the Plaintiff's damages, the court had no trouble concluding that she was injured and awarding summary judgment to the Plaintiff.  <u>Id.</u> at 835.

6.    Before the court could proceed to the issue of damages, however, it had to rule on the Defendant's objection to language it considered too harsh in the Summary Judgment Order.    See Defendant's Motion Pursuant to Fed. R. Civ. P. 52 and 59 at 1—2, Houck v. Substitute Tr. Servs., Inc. (In re Houck), Nos. 11–51513, 15-5028 (Bankr. W.D.N.C. Mar. 1, 2019).    After claiming for six years in this lawsuit that it had not violated the automatic stay, the Defendant admitted the stay violation but argued that it was accidental, not abhorrent, Memorandum of Law Supporting Defendant's Motion Pursuant to Fed. R. Civ. P. 52 and 59 at 1, Houck v. Substitute Tr. Servs., Inc. (In re Houck), Nos. 11–51513, 15-5028 (Bankr. W.D.N.C. Mar. 29, 2019) [hereinafter *Defendant's Brief in Support of Motion to Reconsider*].    The Defendant described its procedures in relation to bankruptcy filings and claimed that its review of 24 similar cases in its files showed that its law firm filed a motion to set aside the foreclosure sale in each instance (except this one).    Id. at 2–3.    The Defendant asked the court to tone down the language of the Summary Judgment Order to prevent the "manifest injustice" of harm to the professional reputations of the Defendant and its attorneys.    Id. at 8.

7.    The court disagreed with the Defendant's objection to the language of the Summary Judgment Order.    While admitting that the "wait and see" language relied on by the Plaintiff was somewhat vague and that the court's comments were directed at the

Defendant's and its law firm's behavior and arguments in this case and not more generally, <u>Houck v. Substitute Tr. Servs., Inc. (In re Houck)</u>, Nos. 11–51513, 15–5028, 2019 WL 2246542, at *2—3 (Bankr. W.D.N.C. May 23, 2019) [hereinafter *Order Denying Defendant's Motion to Reconsider*], the court decided that the language of the Summary Judgment Order was consistent with the information presented to the court through the summary judgment hearing, <u>id.</u> at *2. In particular, the Defendant misrepresented to the court when it received notice of the Plaintiff's second bankruptcy case despite admitting contrary information in its filings[4] and pursued baseless arguments to justify its stay violation up to and including the summary judgment hearing. <u>Id.</u> ("Both of these arguments, (1) that there is nothing a creditor can do when it discovers a technical violation of the stay, and (2) that the dismissal of a case cures a prior stay violation, are contradicted by abundant case law as noted in the Summary Judgment Order" (citing *Summary Judgment Order* at 832—35)).

8.    The court conducted a trial on the last remaining issue in the adversary proceeding, the extent of the Plaintiff's damages, on December 3 and 4, 2019. The parties returned to the courtroom on January 17, 2020 to argue about the Plaintiff's attorney's fees.

---

[4]  The Defendant also continued to argue for a date of notice contrary to the findings of the Summary Judgment Order at trial.

## FINDINGS OF FACT[5]

9.   The Plaintiff presented evidence of several categories of damages, and the court will address each separately.

**Value of Real Estate**

10.   The Defendant's foreclosure in violation of the stay resulted in the Plaintiff's loss of ownership and possession of her residence at 318 Todd Railroad Grade Road, Todd, North Carolina.  The property consisted of a 2000-square-foot doublewide mobile home with 4 bedrooms and 2 bathrooms on 1.8 acres.  The Plaintiff inherited the land, and she and Penley purchased the mobile home for $106,000 in 2005.  The Plaintiff also owned adjoining 2-acre and 9-acre tracts of land.

11.   Penley testified that he thought the real property was worth $230,000 at the time of the foreclosure.[6]  The Plaintiff testified that the value of the property was between $170,000 and $180,000.  The only documentary evidence of the value of the property introduced at trial was Ashe County property tax statements from 2011 and 2012 that show the tax value of the property at the time was $144,000.  The Plaintiff did not introduce any appraisals or other valuations of the property.

---

[5] In addition to the findings of fact specifically referenced in this order, the court hereby incorporates the findings from the Summary Judgment Order by reference.

[6] The Defendant objected to Penley's opinion of the value of the real property and argued that the only layperson qualified to value real estate was the owner. The court asked the Defendant to produce authority showing that a person in Penley's position could not offer such testimony, and the Defendant did not. Penley's valuation, however, was ultimately not a factor in the court's determination of the value of the property.

12.   A letter from the Defendant's law firm confirms that the property sold for $135,311.44 at foreclosure and the foreclosure satisfied the $130,142.89 balance of the mortgage on the property.[7]

**Farm Income**

13.   Penley testified that he and the Plaintiff grew "everything grown in Ashe County" on their three tracts of land: daylilies, beans, corn, potatoes, peppers, and cabbage.  They used about half an acre of 318 Todd Railroad Grade Road, an acre and a half of the 2-acre tract, and part of the 9-acre tract for farming. According to Penley's testimony, the profits from their farming totaled $20,000—$30,000 annually.  The Plaintiff said she did not know how much money they made from farming, but she agreed with Penley's $30,000 estimate.

14.   The Plaintiff introduced photographs of daylilies and crops on the properties, but the only documentary evidence of income from the farming operation that the Plaintiff presented was Penley's handwritten list of income and some expenses from 2010

---

[7] The Defendant went to great lengths at trial to attempt to show that a second mortgage that was also secured by the Plaintiff's adjoining 2-acre tract of land encumbered the foreclosed property.  According to the Defendant, the Plaintiff is not entitled to any damages for the loss of the real property because she did not have any equity due to the two mortgages.  There was evidence admitted at trial that tended to show that 318 Todd Railroad Grade Road was encumbered by the alleged second mortgage and evidence to the contrary.  The possible second mortgage, however, is ultimately irrelevant because it was not satisfied (or paid on at all) at foreclosure according to the Defendant's own evidence, including the letter from its law firm and a proof of claim for the mortgage from Penley's subsequent bankruptcy case.  Since the only secured obligation paid at foreclosure was the $130,142.89 balance of the "first" mortgage and the Plaintiff still owed the "second" mortgage balance after the foreclosure, any value in excess of $130,142.89 was the Plaintiff's equity in the real property for the purposes of this matter.

that he prepared as a "rough estimate" of three months of net income from the farming operation.[8]  Penley testified that he compiled the rough estimate in the process of seeking a loan for the construction of a new barn, but the document does not provide an accurate and complete picture of the Plaintiff and Penley's farming operation.  For example, the rough estimate includes $16,000 of income from a landscaping job, which would include payment for services and not from farming (although Penley said he used the daylilies grown on the property as part of his landscaping), and Penley admitted that the rough estimate did not include some farming expenses such as fertilizer (although they in part used a neighbor's cow manure) and parts for their tractor.

---

[8] The Defendant objected to the introduction of any calculation of damages other than the rough estimate due to the Plaintiff's failure to provide the calculation and documents used to make the calculation prior to trial as required by Federal Rule of Civil Procedure 26(a).  (Federal Rule of Bankruptcy Procedure 7026 makes Federal Rule of Civil Procedure 26 applicable in adversary proceedings.)  The March 9, 2018 Initial Pre-Trial Order in this adversary proceeding requires "any party [that] believes their case would be benefited by strict compliance with Fed. R. Civ. P. 26 and 16 . . . [to] request such relief by proper motion and notice of hearing," the Defendant did not file such a motion, and the Defendant admitted that the court has broad discretion to address this issue, see Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2012 WL 1596722, at *2 (E.D.N.C. May 7, 2012) ("[Federal] Rule [of Civil Procedure] 37(c)(1) provides trial courts wide discretion to remedy violations of Rule 26(a) or Rule 26(e).").  In addition, given the complete dearth of discovery conducted by the Defendant and the Defendant's failure to raise this issue with the Plaintiff until less than a week prior to trial (and more than six years after the litigation commenced), the court questions the amount of prejudice caused by the Plaintiff's failure to provide a calculation and supporting documents.  See Carotek, Inc. v. Textron Fastening Sys., Inc., No. 3:05-CV-395-MKR-DCK, 2008 WL 1777829, at *3 (W.D.N.C. Apr. 16, 2008) ("To the extent Plaintiff was unaware or surprised, it could have availed itself of discovery mechanisms to cure that surprise in a more timely fashion.").  Regardless, the Plaintiff did not produce any other calculations of damages at trial and relied instead on her opinion and the opinions of Penley.  Accordingly, to the extent that it is not moot, the Defendant's objection is hereby overruled.

15.   Penley testified that he kept the books and records for the farming operation, but neither he nor the Plaintiff produced any books and records at trial.  The Plaintiff did not produce any profit and loss statements, balance sheets, income tax returns, receipts, or any other documents other than the rough estimate to substantiate her alleged loss of farm income.[9]  The Plaintiff and Penley continued to use their other two tracts of land for farming but claimed that they lost all of their customers after the foreclosure.

**Rental Income**

16.   The Plaintiff and Penley testified that they used the house on the adjoining 2-acre tract as a vacation rental called "History's Window" prior to the foreclosure, and the Plaintiff lost the rental income when the foreclosure forced her and Penley to use the property on the 2-acre tract as their residence.  They initially used agents to rent History's Window and later rented it themselves through the VRBO website.

17.   Penley testified that they rented the property for $150—200/night depending on the time of year.  He kept the books and records for the rental operation.  The property rented for 200—250 nights a year according to Penley.  After subtracting the

---

[9]   Penley testified that most of the Plaintiff's records were lost when the house on the adjoining 2-acre tract burned to the ground several years later. The Plaintiff did not explain, however, why she had not provided any documentation to her attorneys prior to the fire or why she did not seek records from other sources.

cost of utilities and other normal expenses, Penley said that the rental produced net income of $10,000—$15,000 annually from 2009—2011.  The Plaintiff said she thought the income from the rental of History's Window totaled $10,000 a year.

18.   The Plaintiff did not produce any documentary evidence to substantiate the alleged amount of lost rental income: no books, records, tax returns, bank statements, receipts, VRBO documents, etc.[10]

**Personal Property**

19.   The Plaintiff and Penley claimed that the Plaintiff lost a significant amount of personal property when they were evicted from their home and moved into the property on the 2-acre tract in March 2012, several months after the foreclosure.   The lost property included furniture, clothes, antiques, appliances, dishes, pots and pans, farm equipment, and items with sentimental value, and the Plaintiff and Penley said they lost the property due to a lack of storage space in their new residence and the rushed nature of their move.[11]   While they asked the court to require the Defendant to compensate them for the lost property,

---

[10] Penley blamed the subsequent fire that burned the property formerly known as History's Window for the Plaintiff's failure to produce any documentary evidence related to the rental income, but he did not explain why the Plaintiff failed to gather documents from other sources and had not sent any records to her attorneys during the years between the foreclosure and the fire.

[11] While the Plaintiff moved months after the foreclosure, she testified that she thought the situation would get rectified until she was given 10 days to leave the mobile home.

14

they also said they sold some of it, gave some of it away, and some of it "disappeared."

20.  The Plaintiff did not produce any documentary evidence regarding the value of the lost personal property.  In addition, neither the Plaintiff nor Penley provided the value of any of the personal property, other than the farm equipment, in their testimony.  According to Penley, the farm equipment consisted of a tractor, a tiller, two "mammoth steelers," a plow, a disc, equipment used to "lay off roads," and a planter; was purchased for $10,000 in 2008 and sold for $1500 in 2011 (even though he thought it was worth more than that); and was co-owned by him and the Plaintiff.  The Plaintiff believes that the contents of the barn at 318 Todd Railroad Grade Road, including the farm equipment, were worth almost $40,000.

**Emotional Distress**

21.  The Plaintiff and Penley both testified about the Plaintiff's emotional distress as a result of the foreclosure and subsequent events.  The Plaintiff was in a somewhat unique position among former owners of foreclosed property—since she and Penley moved to their adjoining property, she was aware of activities at her former residence and reminded about the loss of her property during the years following the foreclosure.  For example, Penley described the Plaintiff's pain as they watched the removal of the

topsoil from the land.[12]  Penley described the Plaintiff as two different people before and after the loss of her home: she formerly was an outgoing and active "social butterfly" and subsequently became a recluse who does not enjoy socializing or even talking and who requires medication for her anxiety and in order to sleep.  When she does talk, she cries and discusses this situation.

22.  Penley described the Plaintiff's problems with asthma in the years following the foreclosure.  While she was diagnosed with asthma prior to the loss of her home, the Plaintiff never had any asthma attacks prior to the foreclosure and has suffered three attacks since.  One attack occurred in 2012 when bankers and potential buyers frequently visited the property.  The Plaintiff was unable to stop the attack with her inhaler, emergency medical technicians responded and administered oxygen, and the Plaintiff had to go to the emergency room to get steroids and a breathing treatment.  Another attack happened in 2014 when the property was sold to a couple, one of whom the Plaintiff knew from church, who moved the mobile home.  Penley testified that the Plaintiff passed out and turned purple and subsequently spent five days on a ventilator in the hospital.

23.  The Plaintiff described her pre-foreclosure life as a "mama" to most of the kids in the community, entertaining in her

---

[12] Penley said the topsoil was removed and sold.  The Defendant's attorney asserted that his client did not remove the topsoil.

home, and her familial experiences involving the property, including the deaths of each of her parents. Recalling how her life changed at the end of 2011 brought the Plaintiff to tears, and the court recessed to allow her to compose herself. The Plaintiff said she suffered from anxiety and depression every day since the foreclosure, she did not want to go out or to church because she knew the foreclosure would be the topic of conversation, and the purchase of the property by someone she had known since she was seven years old caused her great pain.

24. The Plaintiff did not produce any medical bills, receipts, or any other documentary evidence of her emotional distress.

**Attorney's Fees**

25. The December 20, 2019 Declaration of M. Shane Perry in Support of Plaintiff's Motion for Attorney Fees and Costs ("Declaration") seeks reimbursement of attorney's fees and costs totaling $236,566.49, including $204,770 in attorney's fees for 546.75 hours over seven years for the Plaintiff's primary attorney and $26,127.49 for 74.65 hours of work by her secondary attorney, $18,246.66 of which was in relation to the two-day damages trial. The Declaration says the 2012 "original fee agreement[13] contemplated $300 an hour," the primary attorney's hourly rate

---

[13] The Plaintiff's primary attorney did not attach the original fee agreement to the Declaration or otherwise make the original fee agreement available to the court.

increased to $350 at the beginning of 2015, and his rate further increased to $400 at the beginning of 2018.  The Declaration mentions the complexity of this litigation and says the primary attorney did not include any time for his many discussions with other attorneys or the time he spent contemplating the issues while he drove his car or mowed his lawn.  The requested fees do not include "the time spent in any other part of this litigation in other courts" and only includes part of the time that the primary attorney spent on telephone calls related to this adversary proceeding because "they were not documented."  Similarly, the Declaration says that the primary attorney did not keep his time spent sending emails, so he reconstructed the emails and billed .1 hours (six minutes) for each.  There is no description of the topic of the emails.  The Declaration seeks $100/hour for 22.2 hours of paralegal time that was not kept contemporaneously, and costs of $3449, including $.10/page for 4,000 copies.[14]

26.  The primary attorney attached a detailed, if sometimes vague,[15] accounting of his time spent on this adversary proceeding since April 24, 2012.  An accounting of the secondary attorney's time is also attached, along with a list of the time, date, and sender/recipient for all of the primary attorney's emails.

---

[14] According to the Declaration, there is "no way to account for all of the printed copies that have been produced in this case," but the primary attorney knows of more than 4,000.
[15] The descriptions of how the attorney spent his time include "research," "Phone call," "continuance," "notes," and "Discovery."  The attorney told the court that the vague descriptions were a litigation tactic to avoid disclosing too much information to the Defendant's attorneys.

## CONCLUSIONS OF LAW[16]

27. When a debtor commences a bankruptcy case by filing a petition, the petition acts as a stay that generally prevents all entities from pursuing pre-petition claims against the debtor. 11 U.S.C. § 362(a). Section 362(a) specifically prohibits "judicial, administrative, or other action[s] or proceeding[s] against the debtor," "any act to obtain possession of property of the estate," and "any act to create, perfect, or enforce any lien against property of the estate." Id.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

Budget Serv. Co. v. Better Homes of Va., Inc., 804 F.2d 289, 292 (4th Cir. 1986) (quoting H.R. REP. No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6296—97; S. REP. No. 95-989, at 54—55 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5840—41). "The automatic stay is a bedrock principle upon which the Code is built; the importance of § 362 cannot be over-emphasized." In re Garner, No. 09-81998, 2010 WL 890406, at *2 (Bankr. M.D.N.C. Mar. 9, 2010) (citing Grady v. A.H. Robins Co., 839 F.2d 198, 200 (4th

---

[16] In addition to the conclusions of law specifically referenced in this order, the court hereby incorporates the conclusions from the Summary Judgment Order by reference.

Cir. 1988)); see In re Franklin, 614 B.R. 534, 543 (Bankr. M.D.N.C. 2020) ("The automatic stay is one of the most fundamental and important protections given to debtors under the Bankruptcy Code." (citations omitted)).

28. With one exception that is not applicable to this adversary proceeding, section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." § 362(k). The injured individual must show "that she filed a bankruptcy petition; that she was an individual protected by the automatic stay provision; that the creditor received notice of the petition; that the creditor's actions were in willful violation of the automatic stay; and that the debtor suffered damages" in order to recover pursuant to § 362(k). *Summary Judgment Order* at 831 (citing Weatherford v. Timmark (In re Weatherford), 413 B.R. 273, 284 (Bankr. D.S.C. 2009)); see also Edwards v. B & E Transp., LLC (In re Edwards), 607 B.R. 530, 536 (Bankr. W.D. Va. 2019) ("To award damages under section 362(k), a court must find that (1) 'a violation occurred,' (2) 'the violation was committed willfully,' and (3) 'the violation caused actual damages.' " (quoting Skillforce, Inc. v. Hafer, 509 B.R. 523, 529 (E.D. Va. 2014))). The Summary Judgment Order concludes that the Plaintiff has shown all of the required elements, including the existence of some

degree of damages, and reserves the issue of the extent of the Plaintiff's damages for trial. *Summary Judgment Order* at 831—35.

29.  The Bankruptcy Code and the relevant legislative history do not provide a definition of "actual damages," In re Seaton, 462 B.R. 582, 594 (Bankr. E.D. Va. 2011), and courts have awarded actual damages under many different theories, see Sundquist v. Bank of Am., N.A. (In re Sundquist), 566 B.R. 563, 587 (Bankr. E.D. Cal. 2017) (listing 17 categories of actual damages, including value of personal property lost, lost business, and emotional distress (citing Eric C. Surette, Annotation, *Remedies and Damages for Violations of the Automatic Stay Provisions of the Bankruptcy Code (11 U.S.C.A. § 362(h)*[17]*), by Parties Other Than the Federal Government*, 153 A.L.R. Fed. 463 (1999 & 2016 Supp.))). While there are many categories of actual damages, any damages must be the result of the stay violation and satisfy the "but for" causation standard frequently used in tort law: "[i]f a consequence would not have occurred 'but for' the automatic stay violations, then courts make awards based on that consequence."[18]  Id.  Even though

---

[17] Section 362(k) was previously known as 11 U.S.C. § 362(h). *Summary Judgment Order* at 831 n.4.
[18] At trial, the Defendant advocated for a more stringent version of the "but for" standard and attempted to convince the court that it could only award damages if the stay violation was the sole cause of the injury. For example, the Defendant argued that there was no harm caused by the foreclosure in violation of the stay because the Plaintiff did not have the financial capability to cure the default on her mortgage. "But for" causation, however, just requires that the stay violation constitutes a cause of the injury, not the only cause, as the Supreme Court recently reminded us in a different context. See Bostock v. Clayton County, Ga., No. 17-1618, slip op. at 5—6 (U.S. June 15, 2020) ("This can be a sweeping standard.  Often, events have multiple but-for causes.  So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the

a debtor loses the protection of the stay when a case is dismissed, the "consequences directly attributable to the violation of the stay before its expiration may continue to be visited upon a debtor for an additional period of time," so "liability for a stay violation continues at least until full restitution is actually made or, if after the expiration of the stay, the court orders full restitution." Id. at 586 (citing Snowden v. Check Into Cash of Wash., Inc. (In re Snowden), 769 F.3d 651, 659 (9th Cir. 2014); Snowden, 769 F.3d at 662 (Watford, J., concurring)). Since this order will end the Defendant's liability for the stay violation, full restitution includes all of the Plaintiff's damages over the last eight years and several months.

30. "The award of actual damages is mandatory" in response to stay violations, but "the burden is on the debtor to demonstrate the extent of any damages." Clayton v. King (In re Clayton), 235 B.R. 801, 810 (Bankr. M.D.N.C. 1998) (citations omitted); accord In re Voll, 512 B.R. 132, 138 (Bankr. N.D.N.Y. 2014) (citations omitted). The debtor must show his actual damages by a

---

intersection, we might call each a but-for cause of the collision. When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.") (citations omitted); see also Sundquist, 566 B.R. at 595, 599, 601, 602, 604, 608, 609 (observing that various types of damages would not have happened "but for" the actions of the creditor). In addition to the technical problem with the Defendant's understanding of the "but for" standard, a requirement that debtors, who are generally in bankruptcy due to financial problems, show that they could repay a creditor prior to allowing recovery for stay violations would gut the protections of § 362. While the court does not accept the Defendant's version of the standard for causation, there were causation problems with the Plaintiff's evidence under the correct standard as detailed below.

preponderance of the evidence, and the evidence should be "concrete" and "non-speculative." <u>Seaton</u>, 462 B.R. at 595. The debtor can use "methodologies that need not be intellectually sophisticated," but the award for damages "cannot be based on mere speculation, guess[,] or conjecture." <u>In re Sumpter</u>, 171 B.R. 835, 844 (Bankr. N.D. Ill. 1994) (citations omitted).

31. Just as there are many types of actual damages that a debtor could assert as a result of a stay violation, there are many ways that a debtor could prove the damages to a court. Here, the Plaintiff's case runs into difficulty. With the exception of photographs of the property and the rough estimate of farming income, the Plaintiff relied almost entirely on her own testimony and that of Penley to establish the amount of her damages. <u>Cf. In re Grason</u>, No. 09-71353, slip op. at 3 (Bankr. C.D. Ill. Sept. 26, 2014) (disallowing actual damages other than attorney's fees in part because the debtor did not provide documentary evidence or calculations and determining that his testimony alone was insufficient). While the testimony was sufficient for the court to conclude that the Plaintiff suffered some significant injury as a result of the Defendant's actions, as more fully explained below, in many respects it was not sufficient to establish the exact amount of damages suffered by the Plaintiff.[19] <u>See Sundquist</u>, 566

---

[19] At trial, the Defendant attempted to damage the Plaintiff's and, to a lesser extent, Penley's, credibility by raising questions about an apparently fraudulent deed that was faxed to the Plaintiff's mortgage company and an allegedly fraudulent credit counseling certificate that was attached to the

B.R. at 600 (awarding damages "in a conservative fashion that will award less than what likely could have been proved with a more focused evidentiary presentation"). For some of her alleged damages, the Plaintiff did not even attempt to quantify the degree of her alleged injuries and expected the court to determine the value of various items of property and types of income allegedly lost due to the Defendant's actions. The Plaintiff told the court that the damage was too significant to quantify—while the court understands her sentiment, it was her burden to do so.

**Value of Real Estate**

32.    The Plaintiff did not call an appraiser to testify about the value of the real estate, but she did produce documentary evidence of the $144,000 tax value at the time of the foreclosure. Penley testified to a higher value, and the Plaintiff offered a range of possible higher values, but neither opinion was sufficiently supported by the witness for the court to rely on it. Accordingly, the court concludes that the value of the property was $144,000. Since the Defendant's letter says the proceeds of the foreclosure paid the $130,142.89 balance of the mortgage on the property, the court will award the difference between the value of the property and the balance of the mortgage, $13,857.11, to

---

Plaintiff's complaint. Since the Defendant did not call any witnesses at trial, its attempts to attack the Plaintiff and Penley were entirely limited to cross-examination. The Defendant's attacks were insufficient for the court to draw any conclusions about the deed and the credit counseling certificate or the Plaintiff's overall reliability as a witness, but they did bolster the court's conclusion that it could not award all of the requested damages based almost entirely on testimony.

the Plaintiff for the equity in the property at the time of the foreclosure.

**Farm Income**

33. Due to the limitations of the rough estimate discussed previously, the court cannot rely on that document to establish the amount of farm income lost by the Plaintiff as a result of the foreclosure. Without the rough estimate, the Plaintiff's evidence of her lost farm income consisted of photographs and testimony. While the photographs were helpful in terms of providing some context for the testimony, they did not establish the value of the crops and flowers. Similarly, the Plaintiff and Penley failed to establish their alleged lost income with any specificity and only offered estimates of total lost annual income. The court cannot rely on these general and vague estimates to establish the value of the lost farm income. In addition, the witnesses did not adequately explain or account for the degree of income lost due to the foreclosure on 1.8 acres of their adjoining 12.8 acres when they could have continued to use the remaining 11 acres for farming. Instead, they claimed that they lost all of their farming income due to the stigma associated with the foreclosure. The court cannot conclude that a foreclosure on the smallest of three adjoining parcels of land that were all used for farming caused all of the farming to stop on the remaining two parcels.

34.  The Defendant challenged the amount of farm income that the Plaintiff lost but did not argue that there was none.  The court is confident based on the evidence presented that the Plaintiff lost at least $1000 in farm income over the last eight years due to the foreclosure; based on the severe limitations of the evidence, however, the court is not comfortable awarding more than that amount.  See Franklin, 614 B.R. at 548 (observing that it is likely that the debtor's actual damages exceeded $150 but determining that the evidence was insufficient to support a larger award).

**Rental Income**

35.  The Plaintiff and Penley testified about the loss of a significant amount of rental income when the foreclosure forced them to move into the property on the two-acre parcel that was formerly used as a rental.  They did not, however, produce any documentary evidence of the rental income, and a rental business is more likely to generate significant records and receipts than, for example, a sole proprietorship farming operation.  See Grason, slip op. at 7 (awarding no damages for lost rental income due to the lack of documentary evidence and calculation of expenses). The Plaintiff should have been able to recreate some records, even if the originals were lost, given the use of VRBO and the likelihood of at least some of the income from the business being reflected in bank statements.  Also, as the Defendant argued, if

the Plaintiff was generating income consistent with the trial
testimony, it raises a question about why she defaulted on her
mortgage and did not cure the default prior to (or after) the
foreclosure.  The Plaintiff did not adequately explain her pre-
foreclosure budget that allegedly included a great deal of income
and an inability to pay her regular expenses.

36.  As with her farming income, the Defendant challenged the
amount of the Plaintiff's income from her real property rental,
but it did not challenge the existence of some rental income.  The
court is confident that the Plaintiff lost at least $1000 in rental
income as a result of the foreclosure but cannot award the amount
sought by the Plaintiff due to the limitations of her evidence.

**Personal Property**

37.  Perhaps the most significant problems with the
Plaintiff's evidence occurred with the alleged loss of personal
property.  As in other categories of damages, the Plaintiff did
not produce any documentary evidence of the lost personal property,
but there were additional problems of proof in this category.  The
Plaintiff alleged that she lost a significant amount of personal
property when she and Penley had to leave their residence several
months after the foreclosure and move to the smaller adjoining
property that had less storage space.  The Plaintiff and Penley
described the move as throwing their stuff across the property
line.  They did not adequately explain why they could not have

27

moved their property in a more organized fashion and found somewhere to store it.   Similarly, the Plaintiff and Penley did not allege values for most of the personal property that they claimed to lose as a result of the foreclosure, and the court cannot determine values that are not in evidence.   Compare Seaton, 462 B.R. at 595—98 (discussing difficulty of establishing the value of used personal property and determining that fair market value is the appropriate standard), with Edwards, 607 B.R. at 536—37 (awarding the original purchase price in addition to other out-of-pocket expenses for the loss of use of a motorcycle).   Some of the property for which the witnesses provided valuation evidence, like the farming equipment, was sold according to the testimony, and the Plaintiff did not adequately explain why the sale price would not represent the fair market value of the property sold.

38.   Due to the lack of a direct link between the foreclosure and the loss of the personal property and the failure of the Plaintiff to provide evidence of the value of most of the property, the court cannot award any damages for lost personal property. See Grason, slip op. at 5 (awarding no damages for lost personal property due to poor evidence); Seaton, 462 B.R. at 598—600 (same).

**Emotional Distress**

39.   Where appropriate, courts allow emotional distress damages for mental injuries suffered as a result of willful stay violations.   See, e.g., Voll, 512 B.R. at 138 (citing bankruptcy

cases from the Northern District of New York).  While this circuit has not traditionally approved emotional distress claims in relation to civil contempt, see Malone v. Golden (In re Malone), Nos. 10-31855, 10-3299, 2012 WL 162374, at *7 (Bankr. W.D.N.C. Jan. 19, 2012) (citing In re Walters, 868 F.2d 665, 670 (4th Cir. 1989); Pague v. Harshman (In re Pague), Nos. 3:01-bk-32061, 3:09-ap-00071, 2010 WL 1416120, at *7 (Bankr. N.D. W. Va. Apr. 5, 2010)), many courts within this circuit have awarded emotional distress damages as compensation for stay violations, see Seaton, 462 B.R. at 601—02 (collecting Fourth Circuit cases that award damages for emotional distress); see, e.g., Franklin, 614 B.R. at 548 n.21 ("Generally, Debtors may recover emotional distress damages under § 362(k)." (citations omitted)); In re Carrigan, 109 B.R. 167, 171—72 (Bankr. W.D.N.C. 1989) (awarding damages for the anxiety suffered by the debtor as a result of a stay violation).

40.  Emotional distress claims present peculiar problems of proof, in this context and others.  See generally Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 395 S.E.2d 85, 327 N.C. 283 (1990) (discussing the long history of and various standards for the tort of negligent infliction of emotional distress in North Carolina).  In the context of stay violations, bankruptcy courts typically require a debtor to show three elements: (1) significant harm, (2) that is clearly established, and (3) a causal connection with the stay violation.  Sundquist, 566 B.R. at 587 (citing

<u>Snowden</u>, 769 F.3d at 656—57; <u>Dawson v. Wash. Mut. Bank, F.A. (In re Dawson)</u>, 390 F.3d 1139, 1149 (9th Cir. 2004)); <u>Seaton</u>, 462 B.R. at 602 (quoting <u>Page Venture, LLC v. Ventura-Linenko (In re Ventura-Linenko)</u>, No. 3:10-cv-138-RCJ-RAM, 2011 WL 1304464, at *9 (D. Nev. Apr. 1, 2011)). Debtors are not, however, required to show a related financial loss in order to be eligible for emotional distress damages. <u>Sundquist</u>, 566 B.R. at 587 (citing <u>Dawson</u>, 390 F.3d at 1149); <u>Seaton</u>, 462 B.R. at 603 (citing <u>Aiello v. Providian Fin. Corp.</u>, 239 F.3d 876, 880—81 (7th Cir. 2001)).

41. There are many methods of providing evidence of mental anguish, including the testimony of the debtor and corroborating evidence from family members. <u>Sundquist</u>, 566 B.R. at 587—88; <u>see Voll</u>, 512 B.R. at 138 n.3 (noting that the testimony of family is one type of corroborating evidence for emotional distress claims (citing <u>Dawson</u>, 390 F.3d at 1149—50)). Emotional distress damages can be allowed based only on the victim's testimony if the court is persuaded by the testimony. <u>Sundquist</u>, 566 B.R. at 589—90. Certain conduct is sufficiently egregious that an emotional distress injury can be presumed, <u>id.</u> at 588; <u>Voll</u>, 512 B.R. at 138 (requiring corroborating evidence unless the circumstances are sufficiently egregious); <u>Seaton</u>, 462 B.R. at 602 (quoting <u>Ventura-Linenko</u>, 2011 WL 1304464, at *9), and courts can even presume some injury to a reasonable person as a result of disturbing but not

egregious circumstances, Sundquist, 566 B.R. at 588; Seaton, 462 B.R. at 602—03 (quoting Ventura-Linenko, 2011 WL 1304464, at *9).

42. The paradigmatic example of a case where egregious conduct justifies emotional distress damages without further corroboration of the injury is a creditor holding or pretending to hold a gun to a debtor's head. See Sundquist, 566 B.R. at 588; Seaton, 462 B.R. at 602 (quoting Ventura-Linenko, 2011 WL 1304464, at *9). Another example occurred in this district 30 years ago. Voll, 512 B.R. at 139 (citing Carrigan); Seaton, 462 B.R. at 602 (including Carrigan in a list of Fourth Circuit cases that awarded emotional distress damages). In Carrigan, the debtor provided for a second mortgage on his mobile home park through his Chapter 13 plan. 109 B.R. at 168. According to the testimony of the debtor and his wife, the individual who held the second mortgage, Cleo Screws, came to the Debtor's residence after 9:00 p.m. on a Sunday night, demanded payment on the mortgage, threatened the debtor, initially refused to leave, and made an obscene gesture to the debtor as he left.[20]  Id. at 168—69. Screws admitted to traveling to the debtor's residence on the night in question but claimed to

---

[20] The Honorable George R. Hodges memorably described the obscene gesture as "the same gesture used by Nelson Rockefeller in dealing with hecklers during his presidential nomination campaign, by Roger Maris in dealing with opposing fans, and by a captured crewman of the U.S.S. Pueblo in a North Korean propaganda photo." Carrigan, 109 B.R. at 169 n.*.  To update Judge Hodges's references, it is also the same gesture that Mini-Me showed Austin Powers during their fight in AUSTIN POWERS 2: THE SPY WHO SHAGGED ME, the singer M.I.A. delivered to an international television audience during Madonna's performance at halftime of Super Bowl XLVI, and Anthony Weiner displayed to journalists after losing the 2013 New York City mayoral race.

have behaved like a gentleman throughout the encounter. _Id._ at 169. The court believed the debtor's version of the evidence and awarded damages for the "bodaciously flagrant" stay violation, concluding that the "outrageous nature of Screws' actions is sufficiently strong to produce the anxiety expressed by the debtor." _Id._ at 170—72; _see also_ _In re Johnson_, No. 15-50053, 2016 WL 659020, at *4 (Bankr. W.D.N.C. Feb. 17, 2016) ("Considering Nationstar's [540 phone calls] in this case, it is understandable why the Debtors experienced psychological and other health complications."); _cf._ _Voll_, 512 B.R. at 140 ("Debtors did not testify to any adverse collateral consequence that resulted from the garnishment, such that the court might infer emotional harm.").

43. Courts considering emotional distress claims as a result of stay violations must keep a couple of additional considerations in mind. The mental injury must be significant in order to deserve compensation, so courts should not award emotional distress damages in connection with each and every violation of the automatic stay as a matter of course. _See_ _Voll_, 512 B.R. at 139. Similarly, it is important to connect the emotional distress directly to the stay violation. _Id._ at 138 (quoting _Dawson_, F.3d at 1149). Debtors in bankruptcy frequently suffer from multiple stressors, financial and otherwise, and it can be difficult to determine the degree to which mental anguish is the result of a stay violation in comparison with other difficulties a debtor may

face. Id. at 136—37 (noting the debtor's testimony about several sources of stress); Seaton, 462 B.R. at 602 ("Segregating the emotional distress experienced by a debtor from the automatic stay violation from other stress sources may be problematic." (citing In re Robinson, No. 06—10618—SSM, 2008 WL 4526183, at *4 (Bankr. E.D. Va. Sept. 29, 2008))).

44. Considering the Plaintiff's evidence in light of the foregoing principles, and despite the shortcomings of her presentation, the court has no trouble concluding that the Plaintiff suffered a compensable emotional distress injury. The testimony of the Plaintiff and Penley clearly established significant harm by describing the Plaintiff's multiple asthma attacks that resulted in hospitalizations and her long-term depression. In addition, the testimony firmly established a causal relationship with the stay violation, as the Plaintiff tied the majority of her most severe emotional reactions to witnessing activity on her former property. Sundquist, 566 B.R. at 581 & nn.43—44 (detailing the "difficult experience" of a debtor returning to the site of a stay violation and how personal property at the site "triggered even more trauma"). Even when activity at the property did not directly trigger the Plaintiff's distress, the testimony connected the events by noting that the Plaintiff would cry and talk about the foreclosure. The Defendant did not produce any evidence that suggested that the Plaintiff's

difficulties were more general and related to her overall financial situation, and the Defendant was the but for cause of all of the Plaintiff's emotional distress.

45. In addition, although Penley did corroborate the Plaintiff's testimony, the Defendant's behavior was sufficiently egregious, or at least disturbing, to establish damages without corroboration. While a foreclosure in violation of the stay may not seem as egregious as a gun to the head or even threatening a debtor in the middle of the night, when one considers all of the circumstances, this was a flagrant violation of the automatic stay. This creditor is not an aggrieved individual who lacked understanding of the requirements of the Bankruptcy Code; instead, the Defendant is an experienced institutional actor represented by one of the leading foreclosure law firms in this state. See Sundquist, 566 B.R. at 610 (noting that Bank of America was a sophisticated creditor that was aware of stay violation law). The Defendant spent years claiming absolute innocence and ignoring the off-ramps provided by the Plaintiff and suggested by this court until the court ruled to the contrary, and stay violation liability continues until the violation is rectified, id. at 586 (citing Snowden, 769 F.3d at 659; Snowden, 769 F.3d at 662 (Watford, J., concurring)). The Defendant further showed the uniqueness of this situation by asking the court to temper the language of the Summary Judgment Order and claiming that its law firm had thoroughly

examined its files and did not find any other examples of similar behavior. *Defendant's Brief in Support of Motion to Reconsider* at 2—3, 8. While the court does not have to precisely determine the level of the egregiousness, both because Penley corroborated the Plaintiff's testimony and the evidence clearly shows a situation that would be disturbing to a reasonable person, the court does believe emotional distress damages are entirely appropriate under these circumstances.

46. Despite the court's opinion of the Defendant's conduct, the Plaintiff's case runs into a familiar problem here too—the difficulty in precisely determining an appropriate amount of damages. Here, as elsewhere, the Plaintiff failed to produce documentary evidence that would have supported her case and would presumably not be difficult to obtain, such as medical bills related to her hospitalizations and treatment. Accordingly, the court will award the Plaintiff $5,000 for her emotional distress injury. See Sundquist, 566 B.R. at 608—09 (awarding $300,000 for debtors' emotional distress based solely on debtors' statements while noting that court would have awarded more with better evidence).

**Attorney's Fees**

47. As acknowledged by the Defendant's attorney at the January 17 hearing, a debtor's attorney's fees are part of the actual damages as a result of a willful stay violation. § 362(k)

("[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."); Sundquist, 566 B.R. at 594; Voll, 512 B.R. at 140, 145 n.10.  Like other actual damages, an award of attorney's fees is mandatory, Sundquist, 566 B.R. at 588; In re Barnes, No. 00-50829, slip op. at 11 (Bankr. W.D.N.C. Jan. 29, 2001) ("Debtors are entitled to the attorney fees for prosecuting this action."), but the fees awarded must be necessary and reasonable, § 329(b) ("If such compensation [to a debtor's attorney] exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive . . . ."); § 330(a) ("After notice to the parties in interest . . . and a hearing, . . . the court may award to . . . a professional person . . . (A) reasonable compensation for actual, necessary services rendered by the . . . attorney and by any paraprofessional person employed by such person; and (B) reimbursement for actual, necessary expenses."); Edwards, 607 B.R. at 537 (quoting In re Miller, 447 B.R. 425, 434 (Bankr. E.D. Pa. 2011)).  The debtor's attorney has the initial burden of showing that his fees are reasonable, and the objecting party has the burden to show that the debtor's attorney billed for too much time.  Voll, 512 B.R. at 141 (quoting In re Abel, No. 95-11044, 2001 WL 36160133, at *3 (Bankr. D. Vt. May 29, 2001)).  The

reasonableness of the fees should be examined as of the time the attorney rendered the services and not with 20/20 hindsight. <u>Abel</u>, 2001 WL 36160133, at *4.

48. Bankruptcy courts disagree about the relationship between attorney's fees and other actual damages. <u>See Clayton</u>, 235 B.R. at 811 n.3 (noting difference in opinion about whether other actual damages are required in order to award attorney's fees). Some courts believe that proportionality between attorney's fees and other damages is a significant factor for reasonableness, <u>see, e.g.</u>, <u>Seaton</u>, 462 B.R. at 605–06, while others, including this court, have awarded fees in far greater amounts than the other actual damages, <u>Johnson</u>, 2016 WL 659020, at *5 (awarding $3297.23 in attorney's fees and $300 in other actual damages); <u>see also</u> <u>Better Homes</u>, 804 F.2d at 290 (affirming $350 in compensatory damages and $1162.50 in attorney's fees); <u>Franklin</u>, 614 B.R. at 552 (awarding $3813.90 in attorney's fees and $150 in other actual damages); <u>Voll</u>, 512 B.R. at 143 (noting cases where attorney's fees were awarded with no other actual damages (citing <u>In re Burkart</u>, No. 08-61077, 2010 WL 502945, at *6 (Bankr. N.D.N.Y. Feb. 9, 2010); <u>In re Seniecle</u>, No. 06-34763, 2009 WL 2902939, at *3 (Bankr. N.D.N.Y. Apr. 20, 2009))); <u>Grason</u>, slip op. at 2–3 (actual damages of $4423 are all for attorney's fees and costs). The court believes the proper approach is to treat the proportionality between attorney's fees and other actual

damages as a non-dispositive factor to consider. See Voll, 512
B.R. at 143.  Courts should attempt to discourage willful
violations of the stay while not "rewarding an excessively
litigious approach" simply because fees will be shifted to the
creditor. Id. at 141 (quoting Seniecle, 2009 WL 2902939, at *3);
see Seaton, 462 B.R. at 604—05 (quoting In re Prusan, No. 09-
49716-CEC, 2010 WL 813778, at *3 (Bankr. E.D.N.Y. Mar. 2, 2010)).
An award of attorney's fees is appropriate when a debtor has to
come to court to address a willful violation of the stay. Johnson,
2016 WL 659020, at *3 (quoting In re Riddick, 231 B.R. 265, 268
(Bankr. N.D. Ohio 1999)).   "[C]reditors may not deny that a
violation of the stay was willful then, after forcing the debtor
to litigate the matter, baldly claim that debtor-counsel's fees
were unreasonable or unnecessary." Voll, 512 B.R. at 142 (citing
Duby v. United States (In re Duby), 451 B.R. 664, 677 (B.A.P. 1st
Cir. 2011); In re Robinson, 228 B.R. 75, 86—87 (Bankr. E.D.N.Y.
1998)).

49. Courts frequently use the "lodestar" approach to
determine the reasonableness of fees pursuant to § 330. See, e.g.,
Sundquist, 566 B.R. at 597 ("Lodestar fees consistent with § 330
are presumptively reasonable for purposes of § 329 so long as they
are proportional in terms of time, rate, and the nature and amount
of the controversy."); Voll, 512 B.R. at 141—45.  To determine a
lodestar amount, a court multiplies the attorney's reasonable

hours by a reasonable hourly rate while considering twelve factors.
Grissom v. The Mills Corp., 549 F.3d 313, 320—21 (4th Cir. 2008)
(citations omitted).  The twelve factors are:

> (1) the time and labor expended; (2) the
> novelty and difficulty of the questions
> raised; (3) the skill required to properly
> perform the legal services rendered; (4) the
> attorney's opportunity costs in pressing the
> instant litigation; (5) the customary fee for
> like work; (6) the attorney's expectations at
> the outset of the litigation; (7) the time
> limitations imposed by the client or
> circumstances; (8) the amount in controversy
> and the results obtained; (9) the experience,
> reputation and ability of the attorney; (10)
> the undesirability of the case within the
> legal community in which the suit arose; (11)
> the nature and length of the professional
> relationship between attorney and client; and
> (12) attorneys' fees awards in similar cases.

Id. at 321 (quoting Spell v. McDaniel, 824 F.2d 1380, 1402 n.18
(4th Cir. 1987)).  The hourly rate is the "critical inquiry," and
it is the attorney's burden to show a reasonable rate.  Id.
(quoting Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990)).
After determining the lodestar amount, a court should subtract
from the total for time spent on unsuccessful claims and award a
percentage based on the degree of success.  Id. (quoting Johnson
v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002)); see Voll,
512 B.R. at 141 (noting that the lodestar amount can be increased
or decreased based on case-specific factors) (citing Arbor Hill
Concerned Citizens Neighborhood Ass'n v. County of Albany, 522
F.3d 182, 188—90 (2d Cir. 2008)).  Appeals courts evaluate lodestar

determinations under an "extremely deferential standard of review." Grissom, 549 F.3d at 322.

50. Most of the lodestar factors in this adversary proceeding either support the Plaintiff's attorney's fee application or are more or less neutral. For example, over the last seven-plus years, this adversary proceeding began in the District Court; was sent to a magistrate; took a couple of trips to the Fourth Circuit, including a successful appeal that depended on the application of a somewhat novel theory (cumulative finality); was sent to this court by the magistrate; was recommended to go back to the District Court by this court; was bifurcated between this court and the state court by the District Court; resulted in summary judgment in favor of the Plaintiff; and required three days of hearings on the Plaintiff's damages in this court. Even without getting into the specifics of the Plaintiff's attorney's fee request, it is clear that this adversary proceeding required a great deal of time and labor, demanded some skill to deliver the necessary legal services, and involved opportunity costs and time limitations for the attorney. Similarly, the Plaintiff apparently consulted with many different attorneys before finding one to take her case, which indicates that this type of case is not very desirable in the legal community. Attorney's fees in stay violation cases vary widely, compare Sundquist, 566 B.R. at 596, 598 (allowing $87,882 in attorney's

fees for work in the state court and the bankruptcy court) with
Seaton, 462 B.R. at 606 (awarding 2.45% ($249.90) of requested
attorney's fees to match the 2.45% of requested emotional distress
damages rewarded), and the court is not aware of any other
successful stay violation litigation that required more than seven
years of work.

51. The Defendant, to its credit, does not deny that the
Plaintiff's attorney deserves to be awarded a reasonable fee for
his work. In order to defend its restricted version of
reasonableness, however, the Defendant resorts to faulty arguments
and ignores its responsibility for increasing the duration of the
controversy and, thus, the Plaintiff's attorney's fees. The
Defendant argues that the Plaintiff could have brought her stay
violation claim as a motion in this court instead of alleging it
along with many state law claims in the District Court. Cf.
Franklin, 614 B.R. at 540 n.7 (determining that debtor bringing
stay violation claim as an adversary proceeding instead of by
motion is of "little consequence"). While it may be true that the
Plaintiff could have brought a simple § 362(k) claim by itself in
this court, she cannot be faulted for her promotion of judicial
economy in trying to bring all of her related claims together, she
may have lost the claims currently pending in state court had she
not asserted them with the § 362 claim, and the District Court
confirmed this court's conclusion that it could not hear the other

claims, Houck v. Lifestore Bank, 582 B.R. 138, 140 (W.D.N.C. 2018)
("If the second bankruptcy case was still active, Judge Beyer would
continue to have 'related to' jurisdiction over those claims;
however, since the second bankruptcy petition has now been
terminated, there is no jurisdiction in the Bankruptcy Court to
consider those state-law claims. This Court's supplemental
jurisdiction cannot now be shared under 11 U.S.C. § 157 with the
Bankruptcy Court." (citing Enron Corp. v. Citigroup, Inc. (In re
Enron Corp.), 353 B.R. 51, 61 (Bankr. S.D.N.Y. 2006))); see also
Sundquist, 566 B.R. at 595—96 (noting that debtors initially
proceeded in state court on multiple theories and approving state
court attorney's fees). Similarly, the Defendant argues that the
other claims dismissed by the District Court without prejudice and
now pending in state court were unsuccessful, but that argument
ignores that a dismissal on jurisdictional grounds is not a
determination on the merits, the other claims are still pending in
state court, and the Plaintiff's attorney is only seeking fees
related to the stay violation claim.

52. Finally, the Defendant had numerous opportunities to
stop the Plaintiff's attorney's clock—some before the clock even
started running—but declined them all, resulting in a long case
fraught with difficulty and undue resistance. See Sundquist, 566
B.R. at 595 (noting that the creditor should not complain about
the extent of the debtors' fees because the creditor's conduct led

to the fees); Voll, 512 B.R. at 142 (rejecting creditor's complaint about debtor seeking sanctions in court when the creditor chose to fight the allegations instead of acknowledging the violation). The Defendant received notice of its technical stay violation a few hours after the foreclosure and did nothing, allegedly because none of its attorneys or employees put all of the information together. The Defendant admits that it realized what happened a few months later but incorrectly determined that it had done nothing wrong and could not do anything to rectify the situation. When the Plaintiff commenced this case, she asked for the Defendant's help in stopping the sale of her former residence to a third party, but the Defendant declined. Early in the litigation, the Plaintiff offered to settle for $5,000, but the Defendant was not interested. See Voll, 512 B.R. at 142 (noting settlement discussions in time records). Here, the court had to inform the Defendant about important admissions in its own discovery responses, and the Defendant ignored the court's suggestions about the problems in its case. In fact, at the damages trial, the Defendant continued to argue that it really did not do anything wrong after admitting the stay violation in its Memorandum of Law Supporting Defendant's Motion Pursuant to Fed. R. Civ. P. 52 and 59. The party to this adversary proceeding that has displayed an excessively litigious approach is the Defendant, not the Plaintiff.

53. Nevertheless, at the risk of repeating itself like a broken record, the court must admit that the Plaintiff's presentation is not without shortcomings. For example, the Plaintiff's attorney provided examples of fees recently approved in bankruptcy cases ranging from $380 to $550 per hour, but all of the cases cited are distinguishable.[21] In addition, the Plaintiff's attorney's lack of experience in this type of litigation shows in his failure to keep detailed and contemporaneous time entries as suggested by the court's Guidelines for Compensation and Expense Reimbursement of Professionals. The attorney also spent excessive time on particular tasks, such as 7.8 hours on a motion to compel, 3.8 hours on a notice of deposition, and 16.1 hours to prepare for two depositions.[22]  See Voll, 512 B.R. at 144 (observing that a court should "exclude hours that are excessive, redundant, or otherwise unnecessary" (quoting Watkins v. Guardian Loan Co. (In re Watkins), 240 B.R. 668, 679 (Bankr. E.D.N.Y. 1999))). While it was reasonable for the Plaintiff to be represented by (and compensated for) two attorneys at the damages trial, especially since multiple attorneys appeared on behalf of the Defendant at most of the hearings and three appeared at trial, it was not reasonable for the Plaintiff's primary attorney to have his partner

---

[21] In defense of the Plaintiff's attorney's examples and as previously noted, there may not be any situations in this district or others that are not distinguishable from this adversary proceeding in some way.
[22] The court notes that the Plaintiff's attorney waived some of the time that he spent on this case, including time spent consulting with outside attorneys.

review every document that he filed. See id. Also, while the
Plaintiff's attorney was successful in establishing the stay
violation despite the necessity of traveling back and forth between
four courts and more judges, the court believes that a more
skillful litigant would have shown the Plaintiff's entitlement to
a larger amount of actual damages. See Sundquist, 566 B.R. at
590, 600, 604, 605, 608, 609 (repeatedly noting the likelihood of
larger damage awards with better evidentiary presentations).

54. In consideration of the foregoing, it is appropriate to
allow the Plaintiff's attorney an hourly rate of $300. See id. at
597 (approving a $300 lodestar rate in a sanctions adversary
proceeding for a foreclosure in violation of the stay). Three
hundred dollars per hour is the rate initially agreed to by the
Plaintiff and her attorney (before the attorney's rate increased
to $350 and then $400) and is less than the examples cited by the
Plaintiff's attorney. In light of the Plaintiff's primary
attorney's timekeeping deficiencies, the excessive time billed for
some tasks, and his failure to establish the full amount of damages
to which the Plaintiff appears to have been entitled, it is
appropriate to reduce his hours by half to 273.375, and 273.375
hours at $300/hour equals $82,012.50. The Plaintiff only requested
fees for her second attorney's participation in trial preparation
and at trial, which is $18,246.66 of the $26,127.49 in his time
sheets, and the second attorney is entitled to the full amount of

the time he spent in connection with the trial. The requested time for emails and for the paralegals' time suffers from the same defects as the primary attorney's time entries in that the time was not kept contemporaneously and the descriptions of the work are vague or nonexistent, so it is appropriate to discount those fees by 50% also, to $4500 and $1110 respectively. The court does not see any problems with the costs requested and will award the full amount of $3449.[23] In total, the court awards $109,318.16 in fees and costs. The court is aware that this amount is significant and significantly more than the amount of the Debtor's other actual damages, but it is less than half of the fees requested by the Plaintiff, and the court feels it is appropriate in light of all of the facts and circumstances of this case, including the duration of the dispute and the Defendant's central role in extending that duration.

**Punitive Damages**

55.  Unlike actual damages (including attorney's fees), an award of punitive damages is not mandatory for willful violations of the automatic stay; instead, the Bankruptcy Code reserves punitive damages for "appropriate circumstances." § 362(k) ("[A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and

---

[23] While the Plaintiff's attorney did not keep track of the 4000 copies contemporaneously, he only billed $.10/page, and the Guidelines for Compensation and Expense Reimbursement of Professionals suggest $.25/page, so the court does not believe that the copying cost needs to be discounted.

attorneys' fees, and, in appropriate circumstances, may recover punitive damages."). Congress did not provide any further guidance on the circumstances where punitive damages are appropriate, Sundquist, 566 B.R. at 609—10 ("[T]here is still much about the law of § 362(k)(1) punitive damages that amounts to writing on a clean slate."), and left the determination to the court's discretion, Franklin, 614 B.R. at 549 (citing Clayton, 235 B.R. at 811); Carrigan, 109 B.R. at 172.

56.   Courts have developed various ways of describing conduct that is especially troublesome and therefore deserving of additional sanction. Punitive damages are appropriate where there is a "reckless or callous disregard for the law or the rights of others," Sundquist, 566 B.R. at 588 (quoting Goichman v. Bloom (In re Bloom), 875 F.2d 224, 228 (9th Cir. 1989)), a standard that is satisfied by actual bad faith, id. Appropriate circumstances for punitive damages can also involve misconduct described as "egregious or vindictive," Carrigan, 109 B.R. at 172 (citation omitted), "malicious, wanton, or oppressive," Sundquist, 566 B.R. at 588 (citing Snowden, 769 F.3d at 657), or "contumacious," Franklin, 614 B.R. at 540. Regardless of the terminology, situations where punitive damages are appropriate generally involve an intentional or reckless stay violation. Id. at 549 (quoting Wells Fargo Bank, N.A. v. Jones, 391 B.R. 577, 608 (Bankr. E.D. La. 2008)); see also Seaton, 462 B.R. at 604 (noting that

courts assess punitive damages for acts involving "creditor conduct beyond willfulness or deliberation and more closely resembling . . . specific intent" (quoting <u>Rountree v. Nunnery (In re Rountree)</u>, 448 B.R. 389, 419 (Bankr. E.D. Va. 2011))).[24]

57. The court previously used "abhorrent," a synonym of egregious, to describe the Defendant's behavior, *Summary Judgment Order* at 834, and declined the Defendant's invitation to soften that language, *Order Denying Defendant's Motion to Reconsider* at *2, so it should come as no surprise that the court believes punitive damages are appropriate for these circumstances. Even if it did not know of the Plaintiff's bankruptcy case when it conducted the foreclosure, as the Defendant argues and the Plaintiff disputes, the Defendant admits that it received notice of the Plaintiff's case a few hours later. Even if the Defendant did not initially put all the pieces together, as it argues, the Defendant admits that it realized a few months later that it conducted the foreclosure in violation of the stay; at that point, the Defendant claims that it thoroughly reviewed the situation and

---

[24] A willful stay violation only requires knowledge of a bankruptcy case and an intentional act in violation of the stay, not the specific intent to violate the stay. <u>Better Homes</u>, 804 F.2d at 292–93 ("There is ample evidence in the record to support the conclusion that Budget Services knew of the pending petition and intentionally attempted to repossess the vehicles in spite of it."); <u>Wagner v. Ivory (In re Wagner)</u>, 74 B.R. 898, 903 (Bankr. E.D. Pa. 1987) ("[T]he willfulness requirement refers to the deliberateness of the conduct and the knowledge of the bankruptcy filing, not to a specific intent to violate a court order."). As discussed at length in the Summary Judgment Order, a technical stay violation becomes willful when a creditor learns of a pending bankruptcy case and does nothing to remedy its conduct. *Summary Judgment Order* at 832–35.

decided that it did not do anything wrong and that there was nothing it could do, two conclusions that are obviously incorrect in light of the relevant law, see *Summary Judgment Order* at 832— 35. Nevertheless, in terms of trying to fix the problem, nothing is exactly what the Defendant has done for almost a decade. See *Edwards*, 607 B.R. at 538 (observing that the creditor had "ample opportunity to correct its violation" but did not and awarding punitive damages). The Defendant took the Plaintiff's residence, property that had been in her family for generations, in violation of federal law. For more than a year after the foreclosure, the Defendant could have admitted its violation and returned the property to the Plaintiff. For years after it conveyed the property to a third party, the Defendant could have apologized and sought to make the Plaintiff whole. See *Johnson*, 2016 WL 659020, at *5 (faulting creditor for taking six months to correct its actions and awarding punitive damages). Instead, the Defendant proclaimed its innocence and refused to admit any culpability until this court ruled to the contrary. After the entry of the Summary Judgment Order, the Defendant admitted its stay violation but continues to argue that the Plaintiff does not deserve much, if any, compensation for the injury.

58. In concluding that the Defendant's actions were egregious and in reckless and callous disregard for the law and the Plaintiff's rights, it is important to note again that the

Defendant is a very experienced institutional creditor represented by and operating through some of the most experienced attorneys that appear in this court. See *Order Denying Defendant's Motion to Reconsider* at *3 (observing that the court is familiar with the Defendant's attorneys and holds them in high regard). The Defendant is not a pro se creditor who is unfamiliar with basic concepts of bankruptcy law like many of the bad actors in stay violation cases. See In re Kimbler, No. 04165-5-DMW, 2020 WL 4005781, at *2, *6 (Bankr. E.D.N.C. July 15, 2020) (assessing punitive damages against individual creditor who instigated criminal charges against debtor in violation of the stay); Franklin, 614 B.R. at 540—41, 552 (assessing punitive damages against car dealership that disabled and repossessed debtor's car in violation of the stay); Carrigan, 109 B.R. at 168—69, 172 (assessing punitive damages against individual mortgagee who demanded payment from debtor in violation of the stay). A law firm that appears in various bankruptcy courts on a daily basis committed the acts that led to the Defendant's liability. The Defendant's contentions that this stay violation was an accident and that it simply misunderstood the relevant law are not credible. At some point, the Defendant likely realized its error,[25] which

---

[25] The Defendant introduced an email from one of its law firm's employees acknowledging its awareness of the stay violation in early April 2012. E-mail from Jamie Maisonet, Foreclosure Status, Status Dep't, Hutchens, Senter, Kellam & Pettit P.A. to Teresa Strickland, Tiffany Thaler, & Sheva T. James (Apr. 2, 2012, 3:31 P.M.) ("I think we have an issue on this [foreclosure]. The borrower filed bankruptcy and we took it to sale."). A different employee of the firm responded by saying attorneys at the firm were looking into the issue and they

would make the ongoing stay violation intentional. At a minimum, the Defendant should have known better, and its acts were reckless, callous, and egregious.

59. The appropriate amount of punitive damages should be based on the goals of deterrence and retribution. See Franklin, 614 B.R. at 549 (quoting Charity v. NC Fin. Solutions of Utah, LLC (In re Charity), Nos. 16-31974-KLP, 16-03121-KLP, 2017 WL 3580173, at *18 (Bankr. E.D. Va. Aug. 15, 2017)); Sundquist, 566 B.R. at 613—14 ("[P]unitive damages serve legitimate governmental and societal interests in punishing unlawful conduct and deterring its repetition." (citations omitted)). Of the two goals, the court believes that deterrence of future bad behavior, by the Defendant and other creditors, is the most important. Johnson, 2016 WL 659020, at *4 ("In determining the amount of a punitive damages award, the court is primarily concerned with changing the behavior that resulted in the stay violation, so the amount awarded should motivate the creditor to correct its conduct. Deterrence to others may be a relevant factor as well." (citing Riddick, 231 B.R. at 269)). Unfortunately, a lack of contrition is a sign that violations will continue, Franklin, 614 B.R. at 550 (quoting Charity, 2017 WL 3580173, at *19 n.66), and the Defendant has not

---

should hope the foreclosure would not be a problem. E-mail of Teresa L. Strickland, Team Leader/Client Servs./Status A, Foreclosure Dep't, Hutchens, Senter, Kellam & Pettit P.A. to Jamie Maisonet, Tiffany Thaler, & Sheva T. James (Apr. 2, 2012 4:23 P.M.) ("[C]ross your fingers y'all."). According to the Defendant's version of the facts, a non-attorney employee of its law firm correctly analyzed the situation and saw a stay violation, and its attorneys reached the opposite, incorrect conclusion.

shown much remorse or that it understands the gravity of its
actions. Similarly, like Bank of America in Sundquist, the
Defendant's "strategy regarding the [Plaintiff] has been infused
with a sense of impunity," 566 B.R. at 616; see Plaintiff's
Pretrial Memorandum of Law at 11, Houck v. Substitute Tr. Servs.,
Inc. (In re Houck), Nos. 11–51513, 15–5028 (Bankr. W.D.N.C. Nov.
29, 2019) (noting that the Defendant claims that any judgment will
be uncollectable due to its lack of capitalization and insurance),
another sign that a substantial award of punitive damages is
necessary to get its attention.

60. The leading Supreme Court cases on punitive damages do
not address punitive damages pursuant to § 362, but they are
helpful. Sundquist, 566 B.R. at 610 (citing Philip Morris USA v.
Williams, 549 U.S. 346 (2007); State Farm Mut. Auto. Ins. Co. v.
Campbell, 538 U.S. 408 (2003); BMW of N. Am., Inc. v. Gore, 517
U.S. 559 (1996)). The Supreme Court's jurisprudence provides three
guideposts for punitive damages: "(1) the degree of
reprehensibility of the defendant's misconduct; (2) the disparity
between the actual or potential harm suffered by the plaintiff and
the punitive damages award; and (3) the difference between the
punitive damages awarded and the civil penalties authorized or
imposed in comparable cases." Id. (citing State Farm, 538 U.S. at
418); see also Franklin, 614 B.R. at 549—50 (discussing the three
guideposts (quoting Charity, 2017 WL 3580173, at *18)).

61.   The first factor, the degree of reprehensibility, examines the creditor's "indifference to or reckless disregard for the rights of others, whether the target of the conduct was financially vulnerable, and whether the conduct involved repeated actions." Franklin, 614 B.R. at 550 (quoting Charity, 2017 WL 3580173, at *19) (internal quotations omitted). Here, the Defendant was indifferent to or at least reckless about the Plaintiff's rights, and the Plaintiff was very vulnerable financially.   While the Defendant's conduct did not involve repeated actions, the Defendant had repeated opportunities, over several years, to correct its error but did not.   "Reprehensible" is another synonym for abhorrent, and, as explained in the Summary Judgment Order and earlier in this order, the court believes the Defendant's behavior displayed a high degree of reprehensibility. See Sundquist, 566 B.R. at 610—12 (concluding that institutional creditor that foreclosed in violation of the stay and did not subsequently rectify the situation acted with a high degree of reprehensibility).

62.   The second guidepost involves the relationship between the amount of actual damages and the size of the punitive damage award.   While the relationship between the two is important, courts cannot always use a simple multiple, especially in situations with a low amount of proven actual damages and/or a high degree of reprehensibility, because the punitive damage award needs to be

significant enough to motivate the Defendant and others to change their behavior.  See Franklin, 614 B.R. at 550 ("[T]he use of any multiple of actual damages would be meaningless and would utterly fail to serve the purposes for imposing actual damages."); Sundquist, 566 B.R. at 612 ("[T]his is a case of substantial actual harm where simplistic rations are of limited utility.").

63.   In the § 362(k) context, the third guidepost examines other punitive damage awards for stay violations.   The amounts vary widely, see Franklin, 614 B.R. at 550—51 (cataloging range of amounts awarded in multiple cases involving car repossessions); see, e.g., Sundquist, 566 B.R. at 618 (awarding $45 million in punitive damages for foreclosure in violation of the stay and related actions (with $40 million earmarked for contributions to consumer rights organizations and law schools and the entire award subject to remittitur to $5 million if the creditor contributes $30 million to the same organizations directly)); Charity, 2017 WL 3580173, at *23 (awarding $100,000 per case in three cases with contribution and remittitur provisions similar to Sundquist), and depend on the facts surrounding the various stay violations, see, e.g., Sundquist, 566 B.R. at 612 (noting the need for a large award to get the attention of Bank of America); Johnson, 2016 WL 659020, at *5 (awarding $100 per call in punitive damages for 540 collection phone calls).

64. Finally, part of the court's consideration in regard to punitive damages is a debtor's responsibility to mitigate her injury from the stay violation.[26]   Clayton, 235 B.R. at 811—12. Mitigation by the debtor requires reasonable behavior under the particular circumstances, Sundquist, 566 B.R. at 594 (citing Eskanos & Adler v. Roman (In re Roman), 283 B.R. 1, 12 (B.A.P. 9th Cir. 2002)), and the court concludes that the Plaintiff generally acted reasonably.   She did not, however, mitigate all of her damages.   For example, she did not remove her personal property from her former residence more promptly to avoid its loss or continue her farming operation on her remaining property.   The court takes this behavior into consideration in fashioning its punitive damages award, as it did in declining to award actual damages for the lost personal property or more damages for the lost income from farming.

65. While all of this guidance regarding punitive damages does not come close to a formula that produces the exact proper amount for the court to award, after consideration of the purposes of punitive damages, the Supreme Court's guideposts, and the facts and circumstances present here, the court will award $130,000 in

---

[26] Similarly, another punitive damages test looks at "provocation by the debtor" as a factor.   See Seaton, 462 B.R. at 595 ("Relevant factors courts consider when determining whether punitive damages should be awarded include: (1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; (4) and any provocation by the debtor." (quoting Rawles v. Wych (In re Rawles), No. 08-00555, 2009 WL 2924005, at *2 (Bankr. D. Md. June 18, 2009))).   There is no evidence of provocation by the Plaintiff, and this four-factor test also supports an award of punitive damages.

punitive damages to the Plaintiff.   The court feels that this is an appropriate amount to get the Defendant's attention without providing a windfall to the Plaintiff.   <u>See</u> <u>id.</u> at 614 (noting the difficulty of balancing the goal of deterring future behavior without awarding a windfall to the plaintiffs).   The amount of the award is roughly equivalent to the Plaintiff's actual damages, including her attorney's fees, and is roughly 6½ times her actual damages without the attorney's fees.   It is appropriate for punitive damages to exceed actual damages as long as they are not "so outrageous as to be impossible for the creditor to satisfy," <u>Edwards</u>, 607 B.R. at 538, and this court and others have awarded punitive damages in far greater ratios to actual damages, <u>see</u> <u>Franklin</u>, 614 B.R. at 552 (awarding $150 in actual damages other than attorney's fees, $3813.90 in attorney's fees, and $15,000 in punitive damages); <u>Edwards</u>, 607 B.R. at 538 (observing that the Fourth Circuit affirmed punitive damages that were 2,000% of the compensatory damages (citing <u>Better Homes</u>, 804 F.2d at 290)); <u>Johnson</u>, 2016 WL 659020, at *5 (awarding $300 in actual damages other than attorney's fees, $3297.23 in attorney's fees, and $54,000 in punitive damages).   Other methods that courts have used to calculate punitive damages would result in a similar or larger amount.   See <u>Franklin</u>, 614 B.R. at 552 n.24 (agreeing that an award of double the scheduled debt is appropriate where actual damages are minimal (citing <u>In re Stephens</u>, 495 B.R. 608, 617 (Bankr. N.D.

Ga. 2013))); <u>Barnes</u>, slip op. at 10—11 (striking a secured claim and canceling the lien as punitive damages for a stay violation).

### CONCLUSION

While the court realizes that this is most likely not the end of the disputes over this situation, it is pleased to reach an end after several years and to conclude this adversary proceeding. The Plaintiff was severely injured by the Defendant's unreasonable and abhorrent behavior in claiming that it was not required to and could not do anything to rectify its technical stay violation once it became aware of it.  The Plaintiff most likely failed to prove the true extent of her damages, but she did show her entitlement to a significant award.  Accordingly, for the reasons explained in this order, the court hereby awards $260,175.27, made up of $20,857.11 in actual damages other than attorney's fees, $109,318.16 in attorney's fees, and $130,000 in punitive damages, to the Plaintiff.  The court will enter a separate judgment consistent with this order.  The Clerk is directed to send a copy of this order to the District Court in reference to its consolidated cases 5:13-cv-00066-DSC and 5:18-cv-00022-MOC.

**SO ORDERED.**

This Order has been signed                    United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.